**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0480n.06
No. 16-2281
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 17, 2017
DEBORAH S. HUNT, Clerk

SAMUEL M. JEROME,

    Plaintiff-Appellant,

v.

LIEUTENANT MICHAEL CRUM; CITY OF
BERKELY,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:    BOGGS, CLAY, and SUTTON, Circuit Judges.

BOGGS, Circuit Judge. An inconsistent recollection of an event is frequently taken as an indication of falsehood. Truth is, life is seldom that straightforward. In this case, Samuel Jerome seeks to establish that the variations in the story of his step-daughter regarding alleged sexual abuse meant that there was no probable cause to arrest him and that an alleged cover-up of those variations by Lieutenant Michael Crum violated his constitutional rights. But because sufficient probable cause existed to detain Jerome, we affirm the district court's grant of summary judgment against Jerome's lawsuit for, among other things, false arrest and malicious prosecution.

I

On May 7, 2013, Judith Stiltner brought her thirteen-year-old granddaughter A.K. to the police station of Berkely, Michigan. A.K. alleged that her stepfather, Samuel Jerome, had

sexually abused her on two occasions over the past six months. According to the notes of the interview prepared by Detective Sergeant Michael Crum (the encounter was not recorded), A.K. stated[1] that around Christmas-time of 2012, while her mother (Stacey Krahe) was in the hospital, Jerome sat next to her on the couch and began rubbing her stomach. A.K. alleged that she asked him to stop, but Jerome continued and lowered his hand until it reached her vaginal area, which he continued rubbing from the outside of A.K.'s clothing. A.K. requested that he stop once more and attempted to leave, but Jerome allegedly held her down with his free hand for several minutes. The second incident alleged by A.K. took place in late April, again while her mother was away. A.K. described being on the couch in the family room when Jerome sat next to her and began rubbing her stomach. When A.K. tried to get up in alarm, Jerome held her down and rubbed her vagina. On this occasion, A.K. stated that Jerome had gone under her clothes to touch her vagina and also rubbed her breasts from both outside and inside of her clothing. According to A.K., Jerome said nothing during either assault although A.K. begged him to stop. Allegedly, Jerome purchased jewelry for A.K. in an effort to buy her silence. Following the interview, Crum notified Child Protective Services and scheduled a forensic interview with CARE House (a social services organization that is trained in forensic interviewing of children) on May 16. Jerome arrived later that day at the police station unbidden and admitted only that he had rubbed A.K.'s stomach, claiming that it had been because her stomach hurt. He offered to take a polygraph examination, which was scheduled for May 21.

---

[1] Although "[i]t is well established that a court may not consider hearsay when deciding a summary judgment motion," *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012), the subject of the current suit is whether the information available to Crum sufficed to constitute probable cause. As a result, the statements "were offered to demonstrate that [Crum]'s investigation of [Jerome] had been undertaken upon probable cause and without malice," rather than to establish their truth, and are not hearsay. *Shipp v. United States*, 212 F. App'x 393, 402 (6th Cir. 2006); Fed. R. Evid. 801(c).

At the CARE House, however, A.K.'s description of events differed. A.K. was interviewed by Tricia Schuster. Although "[e]verything remained consistent about the dates and where she was positioned," A.K.'s "story changed" according to notes prepared by Crum, who was also in attendance at the interview. Now, A.K. explained that while Jerome had rubbed her stomach and rubbed lower, he did not touch her vagina, either above or below her clothing, and described Jerome's rubbing of her breast as accidental. Finally, when Jerome's hand had gone "below her hip bones near her pubic line," A.K. stated that she had asked him to stop and Jerome had done so. Crum observed that he considered it "a complete reversal of her recollection of the assaults . . . just a few days prior." Krahe, A.K.'s mother, asked Crum whether he still believed A.K.'s story and was upset when Crum responded affirmatively. Krahe emphasized that A.K. had changed her story and that they were "being played" by A.K. A few days later, Jerome cancelled the polygraph on the advice of his attorney.

About three weeks later, Crum requested to speak with A.K. to discuss the change in her story, but Krahe refused and told Crum that A.K. had confessed that the entire story had been false. She requested that Crum close the case, but Crum indicated that he preferred to speak to A.K. himself before closing the investigation.

Crum made no progress on the case until July 11, when Stiltner returned to the police office to inquire about the status of the investigation. According to Crum's notes, Stiltner informed him that Krahe was claiming Jerome had passed the polygraph test and that the police did not find A.K. credible and had closed the case. Crum disputed those points and again reiterated his desire to speak with A.K. before closing the case. Stiltner left and returned a few hours later with A.K. Stiltner informed Crum that her daughter was hospitalized out of state for an alleged dissociative-identity disorder, that Stiltner was the legal guardian of both Krahe and

A.K., and that she was permitting Crum to discuss the case with her granddaughter, A.K. A.K. told Crum that her mother had pressured her into changing her story at the CARE House, threatening to commit suicide if A.K. testified against Jerome and warning that A.K. and her ten-year-old sister S.K. would be placed in foster care and raped.[2] A.K. repudiated her CARE House statements and reaffirmed her original statements about Jerome touching her on two occasions and having purchased gifts to keep her quiet. She also stated that Jerome had rubbed her ten-year-old sister's stomach in a similar way and bought her gifts, and expressed fear and concern that Jerome was sexually abusing her sister as well.

On July 14, Stiltner reported that A.K. was missing. Krahe was due to return shortly from her hospitalization. According to Crum's police report, Krahe called A.K. that day on the way home and told her that "there would be severe consequences for ruining the family." To flee from her mother, A.K. left her grandmother's house and did not return. A juvenile-runaway report was created. The next day, Krahe contacted the Berkely police and informed them that she had located A.K. In an attempt to confirm that A.K. had in fact been found, officers requested to see her in person. In what was eventually revealed to be a wild-goose chase, Krahe told officers that she was taking A.K. to Beaumont Hospital because her daughter had been drinking. When an officer arrived at the hospital, the staff explained that A.K. had not been at the facility. The officer next went to Krahe's residence, but no one was home. When contacted by police, Krahe explained that she had decided instead to bring A.K. to Providence Hospital for insurance reasons. But when the officer arrived at Providence, again the staff explained that A.K. had never been at the facility. Crum received a call from Jerome advising him that Krahe

---

[2] This interview was not recorded. According to Crum, it was the practice of the City of Berkely not to record sexual-assault victims' interviews. He also stated it was the department's policy not to record juvenile victims. He noted that there was an exception when officers performed a one-on-one interview with a juvenile of the opposite sex in a particular room at the police station.

had left the state with A.K. Two minutes later, Krahe called Crum, laughing, to inform him that she was already south of Toledo, Ohio, on her way to Georgia. She was furious that A.K. had spoken to Crum, did not believe her daughter, and told Crum that she had lied about the hospitals in order to be beyond Crum's jurisdiction before he could catch on. In Georgia, she explained, the family could "get a fresh start."

Sometime in the following weeks, Krahe returned to Michigan with A.K. (unbeknownst to Crum). Just after midnight on August 2, the police received a phone call and were dispatched to the Krahe residence to investigate "family trouble." After a disagreement over a lighter in A.K.'s room, there had been a physical altercation in the family. Krahe told the police she suspected her daughter of hiding marijuana and ransacked the room with Jerome. Neither the police nor Krahe found any trace of marijuana. A.K. was found with scratches on her chest, an abrasion on her leg, and bruising around her right eye. The parties' stories differed in their accounts of a fight: according to A.K., her mother slammed her head against the bed rail and began suffocating her, and then Jerome threw her against the wall many times. Finally, A.K. described being dragged by her hair upstairs and punched in the eye by Krahe. According to Krahe (through Crum's notes), A.K. scratched her and ran into her finger, causing the injury to her eye. Crum did not find Krahe credible. Krahe also played recordings on her phone of conversations between her and A.K. regarding the sexual assault. Crum was suspicious of the recordings based on past experience with Krahe, and A.K. alleged that the recordings had been staged and made under duress. Krahe and Jerome were arrested for child abuse. Crum also recommended that Krahe be prosecuted for witness intimidation. The Oakland County prosecutor brought charges of domestic violence against Krahe and Jerome. Crum shortly

thereafter submitted the information he had on the case to the prosecutor's office for consideration of criminal-sexual-conduct charges against Krahe and Jerome.

On August 21, Crum received a message from the Oakland County Prosecutor's Office requesting further information about A.K.'s allegations of sexual assault, which was described as "critical to a determination being made on this warrant request." A.K., S.K., and Stiltner came to the police station to discuss the August 2 incident, and Crum used the opportunity to follow up on the sexual-assault claims. In his notes, Crum described A.K.'s recounting of the story as "exactly" the same as her description on May 7. She described Jerome rubbing her vagina from the outside of her clothing on the first incident, and Jerome pinning her down and coming into contact with her vagina below her clothing on the second incident. This interview was recorded, but Crum insists that he was unaware of that fact. Instead, he claims that his partner turned the camera on during an initial interview of S.K. and left it running through Crum's later interviews of Stiltner, A.K., and S.K. During his interview with A.K., Crum asked her to recount the story once more, informing her that no one was questioning her story, but they needed to prepare answers in response to the "legal crap that the defense attorney is trying to pull." He also reinforced her story of why she had recanted earlier: "I know . . . your mom made you change the story." In her description of events at this interview, A.K. stated that Jerome on the first incident had touched her both over and under her clothes. She also stated that Jerome kept asking her "Why?" when she pleaded for him to stop. In her description of where Jerome sat, A.K. stated that he sat on top of her. And finally, A.K. said that Jerome had inserted his finger inside of her. These descriptions were inconsistent in one manner or another with Crum's recorded notes of May 7.

The interview with S.K. provided some additional relevant information for the case. While with her mother, S.K. had claimed that she slept through the August 2 incident. Now that she was not living with her mother, S.K. provided a detailed description of the event, including corroborating A.K.'s story of being dragged by her hair by Krahe. She described changing her story because her mother threatened her.[3] She confirmed that Jerome had been rubbing her stomach as well, but felt that it was not inappropriate and stated that she could not recall any time where Jerome had touched her inappropriately. Crum reported his additional information from the interviews and the prosecutor sought an arrest warrant, receiving it on September 18. Pursuant to this warrant, Jerome was arrested and arraigned, with bail set at $500,000.

On October 9, the Michigan district court held a preliminary examination. At this hearing, A.K.—now fourteen—testified that Jerome had sat next to her on the couch and rubbed her stomach under her clothes. She stated that she told him to stop and he asked, "Why?," and that he refused to stop and touched her vaginal area both on top of and under her yoga pants. She also testified that around May 2013, while the two were in the living room, Jerome also rubbed her stomach under her shirt and moved down to her vagina. She described his finger as coming into direct contact inside of her vagina. In addition, she said that Jerome touched her breasts as well. She also stated that she had changed her story at the CARE House because her mother had told her if she did not, she would kill herself. The judge determined, "based on [A.K.'s] testimony," that probable cause existed and bound the case for trial.

Jerome's trial began on August 4, 2014. After testimony by a number of witnesses, including A.K., Crum testified on August 5 and 7. During his testimony, he stated that he had

---

[3] Some time after this interview, S.K. was returned to Krahe's custody, at which point she again began asserting that she had slept through the incident. Once S.K. was removed from Krahe's custody by court order on September 3, she again provided a description of the events of the night and indicated that she had been told what to say to the police by her mother.

not recorded any of his interviews of A.K. and that it was department policy not to record juvenile victims. As Crum returned home from testifying on August 7, he learned that there had in fact been a recording made of the interviews on August 21, 2013. He returned to the police station and the next morning provided the prosecutor and defense counsel with copies of the recordings, which he had received at around 9 a.m. from a certain Sergeant Hadfield at the police station. After a recess, during which the prosecutor and defense counsel viewed the recordings, the judge asked whether a mistrial was warranted. The prosecutor observed that he did not believe a mistrial was necessary, but in fairness to the defendant, a number of witnesses ought to be recalled for further testimony in light of the video. The defense argued that there was police misconduct, important discovery was not provided, and the interviews were conducted in an inappropriate manner. The court found that there was no misconduct, but because the witnesses would have to be recalled and "this case basically redone," as well as a potential substantive issue with Crum's method of interviewing, it held that there was a manifest necessity for a mistrial without prejudice.[4] Jerome's bail was reduced to $10,000, and a new pretrial date was set for October 8, 2014.

On October 6, the Oakland County prosecutor filed a motion for an order of *nolle prosequi*, on the basis that the State could no longer sustain its burden of proof beyond a reasonable doubt after further investigation. The motion was granted the same day.

On June 24, 2015, Jerome brought suit against Crum (in his individual and official capacities) and the City of Berkely in the United States District Court for the Eastern District of Michigan. His complaint included a number of federal claims—false arrest and false imprisonment, malicious prosecution, denial of due process, and failure to adequately train

---

[4] It is unclear from the record whether the trial court watched the video before declaring a mistrial, but given that the court asked the parties for a description of facts and events contained therein, it seems unlikely.

officers—and state claims—unlawful arrest, malicious prosecution, false imprisonment, and gross negligence. In July 2015, the district court dismissed the state-law claims without prejudice. After Crum moved for summary judgment, the district court held oral argument. Finally, the district court granted Crum's motion, holding that (1) there was probable cause to prosecute Jerome and Crum was entitled to qualified immunity as he had not recklessly disregarded the truth; (2) Jerome could not satisfy the elements of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), because the criminal proceedings had been resolved in his favor; and (3) because there was no underlying constitutional violation, there could be no municipal liability of the City of Berkely. Jerome timely appealed the district court's judgment.

II

We review a grant of summary judgment de novo. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 675 (6th Cir. 2005). In our review, we view factual evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 301 (6th Cir. 2005). Summary judgment is proper where the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A. False Arrest and False Imprisonment

Jerome first asserts a claim under 42 U.S.C. § 1983 for false arrest and false imprisonment. "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky*, 412 F.3d at 677). Where, as here, a facially valid warrant was issued, a plaintiff must "prove by a preponderance of the evidence that in order to procure the warrant, [the defendant] 'knowingly and deliberately, or with a reckless disregard for the

truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Id.* (latter two alterations in original) (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)). We have defined probable cause as knowledge "sufficient to warrant a prudent person['s]" belief that a particular individual had committed an offense. *Id.* at 306. To determine whether probable cause existed, we normally examine the totality of the circumstances, including all inculpatory and exculpatory evidence. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). And so in our determination of whether there was probable cause for Crum to seek Jerome's arrest and detainment, we review with the benefit of all of the evidence at the time of the alleged violation.

To aid in this evaluation, a summary of the evidence at the time of the arrest is in order. First, A.K.'s initial description of events, which included the commission by Jerome of the elements of criminal sexual conduct in the first degree and second degree, Mich. Comp. Laws §§ 750.520b, .520c, was bolstered by Jerome's own statements corroborating part of the story— he admitted to rubbing her stomach, although he denied any wrongdoing. In the usual case, "a victim's accusation that she had been sexually assaulted . . . , standing alone, [can be] sufficient to establish probable cause." *Klein v. Long*, 275 F.3d 544, 552 (6th Cir. 2001). But "the presumption of veracity applies only where the witness is 'someone with respect to whom there is *no* apparent reason to question the person's reliability.'" *Wesley v. Campbell*, 779 F.3d 421, 430 (6th Cir. 2015) (quoting *Logsdon v. Hains*, 492 F.3d 334, 343 (6th Cir. 2007)). Here, A.K. provided a different account at the CARE House, which (if true) was exculpatory for Jerome. Inconsistent descriptions of events are a factor weighing in favor of unreliability. *See id.* at 432. But A.K.'s later explanation of why her story changed—i.e., duress—is made more plausible by the fact that her sister S.K. also told police repeatedly that her mother had made S.K. change her

-10-

own story, that her mother had repeatedly voiced an interest to Crum of his closing the case, and that A.K. suffered physical injuries from Krahe and Jerome in a later incident that she alleged was based in part on her providing her account of events to the police. *See United States v. Provost*, 969 F.2d 617, 621 (8th Cir. 1992) ("Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story."). Together, this evidence would seem sufficient to constitute probable cause.

But there was further evidence that weighed against the culpability of Jerome. Even accounting for the recantation at CARE House, A.K.'s description of events in August did not match her initial description in May. Therefore, the question is whether the inconsistencies between the May 7 and August 21 descriptions are of a sufficient magnitude as to damage the credibility of A.K.'s version of events below the level required for probable cause. Considering all of the evidence, we do not believe so. "[I]nasmuch as [A.K.] persisted in her accusations that [Jerome] twice assaulted her to the extent of testifying under oath in trial [and at the preliminary examination], the alleged inconsistencies cannot reasonably be deemed to compel the conclusion that probable cause had ceased to exist." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). Because Jerome cannot demonstrate that there was no probable cause when his arrest warrant was issued, he cannot meet the required elements of a false-arrest and false-imprisonment claim. The district court's judgment on these claims is therefore affirmed.

### B. Malicious Prosecution

In *Sykes v. Anderson*, this court set out the elements of a malicious-prosecution claim under the Fourth Amendment. Those elements are (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or participate[d] in the decision

to prosecute'"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, 'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty' . . . apart from the initial seizure"; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." 625 F.3d 294, 308–09 (6th Cir. 2010) (alterations in original) (first quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007), then quoting *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)). The crux of the case is whether there was a lack of probable cause for the prosecution. Where there is an indictment (or an independent probable-cause determination by a judge), that usually conclusively determines the existence of probable cause. *See, e.g.*, *Sanders v. Jones*, 845 F.3d 721, 728 (6th Cir. 2017), *as amended on denial of reh'g* (Mar. 20, 2017). But in *King v. Harwood*, 852 F.3d 568 (6th Cir. 2017), we held that malicious pre-indictment nontestimonial acts by police that were material to the prosecution of a plaintiff could rebut the presumptive probable cause established by a grand-jury indictment. *Id.* at 588–89.

The malicious-prosecution claims with respect to the initial arrest of Jerome stand or fall with the probable-cause determination of his false-arrest and false-imprisonment claims. For the reasons we explained above in holding that probable cause existed for Jerome's arrest, he cannot show the lack of probable cause required for a malicious-prosecution claim. And his claim for his continued detention and prosecution fails for other reasons in addition to the existence of probable cause. Jerome cannot show that Crum's omission of the details of the August 21 interview was material to or strengthened the case against him because A.K. stated the same version of events in the preliminary examination that she did in the August 21 interview. As the district court explained, those discrepancies were made evident before the Michigan judge on October 9 by A.K.'s testimony and were made before probable cause was found on the charges.

Crum did not testify at the preliminary examination, nor were his notes or reports used in the probable-cause determination at that hearing. Thus, there was an untainted finding of probable cause that was the source of Jerome's detention; Crum's report had nothing to do with it.

Moreover, even if Crum had maliciously misled the prosecutor into thinking that the August 21 interview had been identical to the initial May interview, A.K.'s testimony at the preliminary examination in October repeating all of the material differences in the August 21 interview removed any materiality of Crum's statements in the maintenance of Jerome's prosecution. The prosecution (and Jerome, for that matter) would have been aware that A.K.'s October testimony differed from her May testimony. Because those differences were the same differences from the August 21 interview, any diminution of probable cause based on those discrepancies would have already been revealed and Crum's contention of consistent testimony would have had little impact upon the decision to continue prosecution. Therefore, the withholding of the information within the August 21 interview was not material to the prosecution. And as a result the district court's grant of summary judgment on this count is affirmed.[5]

## C. *Brady* Claim

The test for claims of denial of due process through the withholding of evidence is derived from *Brady v. Maryland*, 373 U.S. 83 (1963). As explained by the Supreme Court in *Kyles v. Whitley*, 514 U.S. 419 (1995), a due-process violation results where the State suppresses evidence favorable to a defendant, material to either his guilt or punishment, and of a nature that would have had a reasonable probability of changing the result of the proceeding. *See id.* at

---

[5] These reasons being sufficient to affirm the judgment below, we need not explore further reasons that might have also sufficed, such as a failure to demonstrate malice rather than inadvertence to rebut any presumption of probable cause generated by the finding of probable cause at the preliminary examination, *see King*, 852 F.3d at 583, or collateral estoppel, *see, e.g.*, *Molnar v. Care House*, 359 F. App'x 623, 627 (6th Cir. 2009).

-13-

432–33. This court in *Moldowan v. City of Warren*, 578 F.3d 351 (2009), extended that obligation from prosecutors to police officers. *Id.* at 381, 397. But we have held that where "the underlying criminal proceeding terminated in [a defendant]'s favor, he has not been injured by the act of wrongful suppression of exculpatory evidence." *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988). Because here Jerome's criminal proceeding ended in the prosecutor's request for, and the trial court's subsequent grant of, a *nolle prosequi* order, he cannot establish the required elements of a *Brady* claim. Accordingly, the district court's grant of summary judgment on this claim is affirmed.

## D. Municipal Liability

Municipal liability is predicated on the existence of a constitutional violation. *Voyticky*, 412 F.3d at 679. Because Jerome cannot establish that there was a constitutional violation, the district court's grant of summary judgment on his municipal-liability claim is also affirmed.

## III

Jerome's claims depend upon a lack of probable cause to arrest, detain, and prosecute him and on the materiality of Crum's misrepresentation of A.K.'s August 21 interview. But any way that you examine it, those claims fail. Objectively, reviewing all of the evidence ourselves, we can see that probable cause for arrest and detention existed. And what is more, it is clear that all of the arguments against probable cause were in view once A.K. gave her inconsistent testimony at the preliminary examination and yet probable cause was found independent of Crum. Jerome's arguments ultimately are unavailing because nothing Crum did manufactured or removed probable cause. Consequently, the district court's grant of summary judgment to Crum and the City of Berkely is **AFFIRMED**.